**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| STEPHEN WILLIAM JOHNSON, | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **Civil Action No. 3:20-CV-144-BH** |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| **Defendant.** | § | **Consent Case[1]** |

## MEMORANDUM OPINION AND ORDER

Stephen William Johnson (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Titles II of the Social Security Act.  (*See* docs. 1, 20.)  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.  BACKGROUND

On March 13, 2017, Plaintiff filed his application for DIB, alleging disability beginning on July 1, 2016. (doc. 16-1 at 166.)[2]  His claim was denied initially on September 20, 2017, and upon reconsideration on February 8, 2018. (*Id.* at 74, 91.)  On February 26, 2018, Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (*Id.* at 105.) He appeared and testified at a hearing on January 7, 2019. (*Id.* at 38-59.) On March 14, 2019, the ALJ issued a decision finding him not disabled.  (*Id.* at 20-30.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on April 1, 2019. (*Id.* at 162-64.)  The Appeals Council denied his request for review on November 18, 2019,

---

[1] By consent of the parties and the order of transfer dated April 15, 2020 (doc. 19), this case has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the

making the ALJ's decision the final decision of the Commissioner. (*Id.* at 6-8.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**A.**     **Age, Education, and Work Experience**

Plaintiff was born on October 9, 1969, and was approximately 46 years old at the time of the hearing. (*See* doc. 16-1 at 29.) He had a high school education and past relevant work experience as a truck driver. (*See id.* at 56, 186.)

**B.**     **Medical Evidence**

In September 2016, Plaintiff saw Serina Huerta, Ph.D, at the Dallas VA Medical Center for a mental health consultation. (*Id.* at 374.) He reported having anxiety, difficulty sleeping, irritability, and "mild difficulty in being able to control [his] noted worry." (*Id.* at 374-75.) He was in the Gulf War and reported seeing things that "people shouldn't see," but denied having frequent nightmares. (*Id.* at 375.) He was overstimulated and irritable in big crowds and was unsure if his "profuse sweating" in these settings was the result of a medical condition "or just [him]." (*Id.*) Plaintiff was cooperative, his mood was anxious, he was alert and maintained good eye contact, his judgment and insight were appropriate, and there was no evidence of hallucinations, delusions, or suicidal or homicidal ideations. (*Id.* at 378.) His scores on the PHQ-9 and GAD-7 screenings showed only mild levels of depression and anxiety. (*Id.* at 378.) Plaintiff was diagnosed with unspecified trauma related disorder, chronic pain, and moderate tobacco use disorder. (*Id.* at 379.)

On October 25, 2016, Plaintiff saw Dr. William Arrington, D.P.M., for bilateral foot pain. (*Id.* at 288-90.) He reported constant pain that was not relieved by anti-inflammatories, icing, or changing his shoes. (*Id.* at 288.) General examination revealed a medially dislocated hallux,

severe arthritic changes throughout his first metatarsal phalangeal joint, and crepitus with range of motion. (*Id*. at 289.) X-rays showed severe hallux varus deformity with a medially deviated second digit in his right foot. (*Id*. at 288.) X-rays of his left foot showed severe degeneration joint disease of the first metatarsal phalangeal joint, lateral deviation of the fifth metatarsal head with a tailor's bunion deformity, and notable hallux interphalangeus deformity. (*Id*. at 288.) He was diagnosed with hallux varus in his right foot, hallux limitus and tailor's bunion in his left foot, and osteoarthritis. (*Id*.) Dr. Arrington recommended surgery and educated Plaintiff on the associated benefits and possible complications. (*Id*.)

From December 2016 through January 2017, Plaintiff saw Dr. Arrington for a first toe metatarsophalangeal joint arthrodesis in his right foot and a follow up. (*Id*. at 276-77, 292-93, 309-11.) Minimal edema and erythema were noted post-operation; the incision was well coapted with no gapping noted and "minimal POP to the surgical site." (*Id*. at 277.) He was instructed to elevate his foot 2-3 times when at rest and ice the back of his ankle to decrease swelling. (*Id*. at 280.) At a follow up visit, Dr. Arrington found that his right foot was doing well postoperatively, but he would need to remain in a fracture boot for 3-4 weeks. (*See id*. at 309-11.)

In February 2017, Plaintiff saw Gregory D. Dayton, Ph.D., at the Dallas VA Medical Center for a psychology compensation and pension consultation. (*Id*. at 339-45.) He did not meet the criteria for post-traumatic stress disorder but was diagnosed with adjustment disorder with anxiety; he had an "[o]ccupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care[,] and conversation." (*Id*. at 340.) Dr. Dayton also noted that Plaintiff's scores on depression and anxiety screenings showed

3

only mild anxiety and depression, he perceived his anxious distress as situational, and while Plaintiff described some trauma events during his military service, he did not discuss war or service-related traumas during his individual therapy sessions. (*Id*. at 341.) Plaintiff was only able to identify irritability as a symptom that he had experienced since the war, and he reported that he never thought of himself as having post-traumatic stress disorder or any other mental condition until a veteran friend of his suggested he look into it. (*Id*. at 342.)   There was no evidence that he had any other mental health symptoms until he lost his job, had changes in his finances and family role, and had medical issues. (*Id*. at 345.)   Dr. Dayton concluded that Plaintiff's irritability would make it more likely that he could become involved in verbal confrontations with supervisors or coworkers if required to work in close proximity them, such as in an office setting or part of a team. (*Id*.)

Plaintiff also saw Marolyn J. Pearson, P.A., at the Dallas VA Medical Center in February 2017, for a general medical exam and an orthopedic surgery compensation and pension consultation. (*Id*. at 345-370.) He reported a burning sensation and pain at the dorsal and medial aspect of his right and left big toe, pain when stepping off, pain at his Achilles tendon, and bilateral sharp pain in the plantar surfaces of his feet. (*Id*. at 350.) His pain was aggravated by walking on hard surfaces, being on his feet longer than 45 minutes, and wearing shoes other than slippers or soft shoes. (*Id*.)   He had pain in both feet, which resulted in a functional loss, as well as pain on movement, weight-bearing, disturbance of locomotion, and interference with standing. (*Id*. at 353-54.)

During his orthopedic surgery exam, Plaintiff reported a constant dull pain in his lower back that was aggravated by being on his feet. (*Id*. at 361.) He could not lift over 60 pounds, go

up and down a ramp, or sit for longer than 2-3 hours without pain. (*Id*. at 368.) He had negative straight leg raises, and his muscle strength, reflexes, and sensory exam were normal. (*Id*. at 364-65.) Plaintiff was diagnosed with degenerative arthritis and "S/P bunionectomy" on both feet. (*Id* at 349.) An x-ray of the lumbar spine showed degenerative changes at T-12-L1 with disc space narrowing, endplate sclerotic changes, and anterior osteophytes without significant change; there was no evidence of fracture or malalignment. (*Id*. at 369.) There was also questionable disc space narrowing at L5-S1. (*Id*.)

In April 2017, Plaintiff presented to the Dallas VA Medical Center for an elective left heart catheterization with staged percutaneous coronary intervention of the distal right coronary artery bifurcated lesion. (*See id*. at 633.) He was discharged in stable condition with an ejection fraction of 62%, and he was restricted from heavy lifting for two weeks (*Id*. at 634.)

From May 2017 through August 2017, Plaintiff participated in approximately 30 cardiac rehabilitation sessions, denying any shortness of breath or angina. (*Id*. at 1155-1216.) He reported that he had walked five miles and his legs were tired, but he was otherwise doing well. (*Id*. at 1163.) He also reported that his balance had improved, and that he had lower back pain after playing basketball. (*Id*. at 1205, 1207,1209.)

On June 27, 2017, Joel Forgus, Ph.D., a state agency psychologist consultant (SAPC) completed a psychiatric review technique and a mental residual functional capacity (RFC) assessment based upon the medical evidence. (*Id*. at 66-68.) He found that Plaintiff's severe medically determinable impairments were acute myocardial infarction, degenerative disc disease (DDD), and trauma and stressor-related disorders. (*Id*. at 67.) Plaintiff had mild limitations in ability to understand, remember, or apply information; mild limitations in ability to interact with

others; and no limitations in his ability to concentrate, persist, or maintain pace, and adapt or manage oneself. (*Id*. at 68.)

On July 20, 2017, Plaintiff saw Dr. David Ukoha, M.D., for a consultant examination. (*Id*. at 621.) He reported back pain, arthritis, joint pain, and bilateral foot pain. (*See id*. at 621-23.) His gait, sensory exam, hearing, grip strength, and fine motor control were normal, and his deep tendon reflexes were 4+ in all extremities without any evidence of pathological reflexes. (*Id*. at 623.) Plaintiff had difficulty squatting, hopping, and tandem walking because of bilateral foot pain and lower back pain. (*Id*.) Bilateral foot and ankle exams showed full range of motion in all angles, minimal swelling of the bilateral big toes, no medial or lateral mallear tenderness, and no swelling of the ankle. (*Id*. at 624.) His spine showed minimal decreased range of motion in all angles due to lower back pain and positive straight leg raises bilaterally. (*Id*.) X-rays showed normal vertebral body height, and no acute fracture, subluxation or wedge deformation was seen. (*Id*.) He was assessed with chronic nonspecific lower back pain and degenerative joint disease of the lumbar spine. (*Id*.)

In August 2017, Plaintiff was referred by Mahmood B. Panjwani, M.D., for an echocardiogram. (*Id*. at 861.) His echocardiographic report showed he had an enlarged right ventricle, left ventricular hypertrophy, mild aortic regurgitation, and normal left ventricular systolic and diastolic dimensions and volumes with an ejection fraction of 45%. (*Id*.)

From August 2017 through October 2017, Plaintiff saw Dr. Huerta for individual psychotherapy. (*Id*. at 929-938.) He reported anxiety because of financial stressors, difficulty being around people, and irritability and frustration because of his medical conditions and issues with his children. (*Id*. at 930, 933, 935, 937-38.) He planned to continue going to the gym after

his cardiac health rehabilitation, and although he had decreased energy levels, he managed to mow the lawn in three hours. (*Id*. at 935, 937.) He ambulated independently without the use of any assistive device; some intermittent repositioning around his body within his seat was observed; his affect was context congruent; and his overall behavior was appropriate. (*Id*. at 929, 932, 934, 936.) Dr. Huerta noted that it did not appear that Plaintiff had been practicing any relaxation techniques outside of his visits. (*Id*. at 933.) Dr. Huerta introduced two new relaxation exercises, encouraged him to practice calm breathing exercises daily, and provided supplemental material on stress to help assess his stress cues. (*Id*. at 931, 933-36, 938.)

On September 19, 2017, State Agency Medical Consultant (SAMC) Kim Rowlands, M.D., completed a physical RFC assessment based upon the medical evidence in the record.  (*Id*. at 67-73.) She identified Plaintiff's medically determinable impairments as acute myocardial infraction, DDD, and trauma and stressor related disorder. (*Id*. at 67.)  She found that he had the following exertional limitations: occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk for a total of 4 hours; sit for about 6 hours in an 8-hour workday; push and pull unlimited weight (other than shown for lift and carry) with no restrictions on hand or foot controls; occasionally climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; occasionally stoop; frequently balance, kneel, crouch, and crawl, with no manipulative limitations; and no visual, communicative, or environmental limitations. (*Id*. at 70-71.) Based on his physical RFC, Plaintiff had the maximum sustained work capability for sedentary work.  (*See id*. at 72.) The SAMC found that Plaintiff's alleged symptoms were partially consistent with the objective medical and other evidence in the record. (*Id*.)

On February 5, 2018, Patty Rowley, M.D., another SAMC, reviewed the medical evidence and completed a physical RFC assessment that mirrored Dr. Rowland's physical RFC. (*Id*. at 86-90.) She also affirmed Dr. Rowland's opinion finding that Plaintiff's alleged limitations were partially supported by the medical evidence and other evidence in the record. (*Id*. at 86.)

On February 8, 2018, Susan Posey, PsyD., a SAPC, completed a psychiatric review technique and a mental RFC assessment for Plaintiff. (*Id*. at 83-85.) She found that his severe medically determinable impairments were acute myocardial infarction, DDD, and trauma and stressor-related disorders. (*Id*. at 84.) He had mild limitations in ability to understand, remember, or apply information; mild limitations in ability to interact with others; and no limitations in his ability to concentrate, persist, or maintain pace, and adapt or manage oneself. (*Id*.) She concluded that Plaintiff's anxiety was a result of physical impairments, and his limitations imposed "no more than a non-severe impact functioning." (*Id*. at 85.)

On February 13, 2018, Plaintiff saw Sabna Thoppil, M.D., his primary care physician, for fatigue, tightness in his chest, and depression. (*See* at 1426.) He reported that Neurontin helped reduce the pain and numbness he experienced at night, and he requested a refill on Flexeril to help with his back pain. (*Id*.)  Plaintiff's breathing appeared unlabored; he had no palpable tenderness, masses or crepitation; and he had para-vertebral muscle spasms in his lumbar spine. (*Id*. at 1427-28.) Dr. Thoppil advised Plaintiff to continue his current medications, referred him to the mental health department for his depression, and instructed him return for a follow up in three months. (*See id*. at 1428.)

In April 2018, Plaintiff presented to the Dallas VA Medical Center for x-rays of his left foot. (*See id*. at 1260-63.) Imaging showed normal mineralization, a hallux valgus/bunion deformity of the first digit, moderate first metatarsophalangeal joint arthropathy with marginal spurring, joint space loss, subchondral changes, and mild posterior calcaneal spurring at the distal Achilles tendon attachment. (*Id*. at 1262.) He was diagnosed with a bunion deformity. (*Id*.)

On May 14, 2018, Plaintiff saw Dr. Huerta for a "PCMHI" follow up. (*Id*. at 1388.) He reported mild issues with sleeping and difficulty pinpointing the factors that were causing anxious distress; he admitted to feeling on edge; and his primary response was to isolate. (*Id*. at 1390.) He and his wife were approved for bankruptcy, and he felt they were now "in a good place." (*See id*.) When he was in a social setting and felt overwhelmed or needed a break, he would use a code word to communicate to his wife that he had "done too much or been stressed out." (*Id*.) Plaintiff was appropriately dressed, ambulated independently with no use of assistive device, and had good grooming and hygiene. (*Id*. at 1389.) Intermittent repositioning of his body within his seat was observed, he was moderately responsive to redirection when warranted, his affect was context congruent, and his overall behavior remained appropriate. (*Id*.)  There was no unusual thought content, delusions or "AVH," but his thought process was tangential at times. (*Id*.) His PHQ-9 screening score for depression was within the minimal depression range, and his GAD-7 score for anxiety was in the moderate anxiety range. (*Id*. at 1390.) Dr. Huerta recommended that Plaintiff practice calm breathing exercises daily, and noted that a referral to couples/family therapy would be re-addressed at the next session. (*Id*. at 1391.)

In June 2018, Plaintiff saw Dr. Arrington for bunion pain and a "[f]irst metatarsophalangeal joint fusion with screw and plate fixation." (*Id*. at 1146, 1150.) He reported

constant pain in his left foot that he rated at a 9 out of 10. (*Id*.) Examination of his left foot revealed "crepitus with range of motion and stiffness" at the first metatarsophalangeal joint, arthritic changes that caused localized swelling and pain, and difficulty rolling off his foot. (*Id*. at 1147.) During surgery, an 80% of cartilaginous loss was noted, and "[e]xcellent rigidity" and "excellent alignment" were noted post-fusion. (*See id*.) Plaintiff was discharged with instructions to elevate his foot at rest, ice the back of his ankle to decrease swelling, and follow up with Dr. Arrington in five to seven days. (*Id*.)

At a follow up visit with Dr. Arrington in July 2018, Plaintiff reported doing better; he had some swelling at the end of the day but denied any new complaints. (*Id*. at 1243.) He was not taking any pain pills and was satisfied with his progress. (*Id*.) Examination revealed mild discomfort around the first metatarsal phalangeal joint, the alignment looked "great," no open lesions were noted, and there was no sign of infection. (*Id*. at 1244.) Plaintiff was advised to follow up in four weeks. (*Id*.)

On August 16, 2018, Plaintiff saw Dr. Huerta for individual psychotherapy. (*Id*. at 1361.) He reported that he was "more irritable, more snappy," and that his distress had gotten to the point where he wasn't able to "go to Walmart with [his] wife and daughter." (*Id*. at 1362.) He was challenged by his lack of employment and diminishing finances, his progress with social security disability, and the "subsequent impact on his coping resources." (*Id*. at 1362.) He was "worked up" and had no patience, and described his mood as "pissed off depressed." (*Id*. at 1363.) Plaintiff ambulated independently with no assistive device, intermittent repositioning of his body within his seat was observed, he was moderately responsive to redirection when warranted, and appeared more subdued in comparison to prior sessions. (*Id*. at 1361-62.) His

10

affect was context congruent, his mood was tired, and his overall behavior remained appropriate. (*Id*. at 1362.) His PHQ-9 score was in the moderate depression range, and his GAD-7 score was in the severe anxiety range, but he "declined to pursue medication review with PCMHI prescriber." (*Id*.) Dr. Huerta advised Plaintiff to practice calm breathing exercises and "to look into programs that [he] could qualify for with respect to work." (*Id*. at 1363.)

On September 26, 2018, Plaintiff saw Cheryl Fleischman, M.D., for chronic lower back pain, pain in his left foot, and pain in his right thigh and calf. (*Id*. at 1288-93.) He reported that his lower back pain was a 9 on a scale of 10, and was aggravated by prolonged standing, stooping, and sitting. (*Id*.) He had a sharp pain in his right thigh that was present first thing in the in the morning and at the end of the day. (*Id*.) Physical examination revealed "[f]unctional ROM in his [l]umbar limited in all directions;" his gait was stiff but normal, with no tender points in his lower back, minimal tender points to palpation of the right great trochanters, and decreased sensation over the right peroneal cutaneous nerve distribution. (*Id*.) A nerve conduction study and electromyography screen showed evidence of sensory polyneuropathy in his lower limbs. (*Id*. at 1292.) Plaintiff was assessed with degenerative joint disease in his hips and referred to his primary care physician "to discuss results of this consult/study results, and to discuss possible further evaluation(s)/possible treatment options." (*Id*.)

In October 2018, Plaintiff presented to the Dallas VA medical Center for an MRI of his lumbar spine with and without contrast, and hip x-rays. (*Id*. at 1258, 1260.) Imaging showed mild degenerative disc desiccation of the L4-L5 and L5-S1 discs. (*Id*. at 1259.) Alignment, vertebral body heights, and narrow signal were unremarkable in their appearance at the remaining levels, but disc height, signal and shape were otherwise normal. (*Id*.) X-rays showed

mild degrative joint disease of both hips, but there was no evidence of fracture or other abnormality. (*Id*. at 1260.)

On November 6, 2018, Plaintiff presented to the Dallas VA Medical Center for a follow up visit with Dr. Thoppil, and a physical therapy consult with Michael Scot Jebsen, PT. (*Id*. at 1449-55.) He reported back pain and depression because he could not work. (*Id*. at 1450.) He had a limping gait, para-vertebral muscle spasms, and positive right-side straight leg raises. (*See id*. at 1453.) He was alert, pleasant and cooperative; his speech was normal; he denied any hallucinations or delusions; his judgment and insight were good; and he did not have suicidal or homicidal ideation. (*Id*. 1453-54) Dr. Thoppil prescribed Cymbalta and advised a follow up in three months. (*Id*. at 1454.) At his physical therapy consultation, Plaintiff reported that his doctor "talked about a walker," but he wasn't ready for one and instead requested a cane. (*Id*. at 1449.) His range of motion and manual muscles tests were within functional limits, he had modified transfers, and both his static and dynamic standing balance were good. (*Id*.) The physical therapist issued him a cane and demonstrated "mod I use of single point cane." (*Id*. at 1450.)

## C.   **Hearing**

On January 7, 2019, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (*Id.* at 38-59.)  Plaintiff was represented by an attorney. (*Id.* at 38.)

### *1.   Plaintiff's Testimony*

Plaintiff testified that he had bilateral bunionectomies in the military, and he later had surgery on both his feet to place plates and pins in them. (*Id*. at 40.)  He had swelling in his feet if he stood for longer than 30 to 40 minutes, and he could walk around the block on his own, but not on a consistent basis. (*See id.* at 40-41.) His pain level was consistently at a 7 or 8 out of 10,

and increased to a 10 out of 10 if he walked around. (*Id*. at 41.)  He usually napped one to two hours during the day because his pain medication made him drowsy, and he had trouble sleeping at night because of his hip pain (*Id*. at 42, 46.) He had back pain and neuropathy in both his legs that caused constant pain, which was aggravated by movement. (*Id*. at 42-43) He used a cane because his legs gave out, and he had fallen a few times. (*Id*. at 43.) Plaintiff spent most of the day with his feet elevated; he had arthritis in both hips and had pain and discomfort from sitting or standing too long. (*Id*. at 44.)

Plaintiff testified that he had PTSD and anxiety from serving in the Gulf War. (*See id*. at 46.) He didn't interact with many people outside of his family. (*Id*. at 48.) He became anxious and agitated in crowded places, such as the grocery store or his son's football games, and needed to leave to relieve his anxiety. (*See id*. at 47.) He stopped taking his anxiety medication because he thought it was too strong and made him feel like he was "having another heart attack." (*Id*. at 47-48.) He had a heart attack in 2017, and had surgery to "put in some stents." (*Id*. at 49-50.)

Plaintiff returned to work as a truck driver but stopped after approximately three weeks because he had trouble getting in and out of the truck and sitting down. (*Id*. at 51.) He could sit, stand, and walk no more than an hour before his back started bothering him. (*Id*. at 52.) His back pain "generate[d] across [his] hips, and down [his] legs, which just annoy[ed] the neuropathy[.]" (*Id*. at 53.) The pain from his degenerative joint disease in his hip radiated down his leg. (*Id*.) He could lift a gallon of milk, cook, and mow the grass in stages, but required 20 to 30 minute breaks (*Id*. at 53-54.)

### 2.    *VE's Testimony*

The VE testified that Plaintiff had past relevant work experience as a truck driver,

Dictionary of Occupational Titles (DOT) 904.383-100 (medium, SVP-4). (*Id*. at 56.) She considered a hypothetical individual with the same age, education, and work background as Plaintiff who was limited to simple routine tasks consistent with unskilled work that is learned by rote or demonstration, with simple instructions, few workplace changes, little judgment required; and simple and direct supervision; and a physical RFC for sedentary work. (*Id*. at 57.) He could lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; stand and walk for at least two hours of an eight-hour workday; use a cane or other handheld assistive device to walk; and sit for about six hours of an eight-hour workday.  He had no additional limitations regarding pushing, pulling, operation of hand or foot controls; could occasionally climb ramps and stairs, stoop, kneel, and crouch; could not climb ladders, ropes, or scaffolds; and had to avoid exposure to hazardous moving machinery and unprotected heights. (*Id*.)

Given these limitations, the hypothetical individual could not perform Plaintiff's past work as a truck driver. (*Id*.) He could work as a table worker, DOT 739.687-182 (sedentary, SVP-2), with approximately 125,000 jobs nationally and 6,700 jobs in Texas; patcher, DOT 723.687.010 (sedentary, SVP-2) with approximately 65,000 jobs nationally and 5,000 jobs in Texas; and food & beverage order clerk (sedentary, SVP-2), DOT 209.567-014, with approximately 200,000 jobs nationally and 14,000 jobs in Texas. (*Id*. at 30, 58.) The VE's testimony was consistent with the DOT. (*Id*. at 58.)

In response to questioning from Plaintiff's Attorney, the VE testified that a hypothetical individual who had the additional limitation of needing to lie down for two hours during the average workday could not sustain employment. (*See id*.) A hypothetical individual who missed one day of work per month could not sustain employment. (*See id*.)

14

D.     **ALJ's Findings**

The ALJ issued a decision denying benefits on March 14, 2019. (*Id.* at 30.)  At step one, he found that Plaintiff had met the insured status requirements through December 31, 2021, and had not engaged in substantial gainful activity since the alleged onset date of July 1, 2016.  (*Id.* at 22.)  At step two, the ALJ found that he had the following severe impairments: history of myocardial infarction, coronary artery disease status post angioplasty with stents, bilateral hallux valgus status post-surgery, degenerative disc disease of the spine, obesity, affective disorder and anxiety disorder. (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 25.)

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work; lift and/or carry 10 pounds occasionally and lift and/or carry less than 10 pounds frequently; stand and/or walk for two hours in an eight-hour workday; and occasionally climb ramps/stairs, stoop, kneel and crouch, but not climb ladders, ropes or scaffolds, and must avoid exposure to hazardous moving machinery and unprotected heights. (*Id.*) He could understand, remember, and carry out simple, routine tasks learned by rote or demonstration, with simple instruction, few workplace changes, little judgment required, and simple and direct supervision. (*Id.*) At step four, the ALJ found that he was unable to perform any past relevant work.  (*Id.* at 29.)  At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that he was not disabled whether or not he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy

15

that he could perform.  (*Id.*)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from July 1, 2016, through the date of the decision. (*Id.* at 30.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Id.*  The court may therefore rely on decisions in both areas without distinction in reviewing

an ALJ's decision. *See Id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the

17

claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.    [Whether] the ALJ failed to develop the record in light of the lack of opinions containing functional limitations, the state agency consultants stating that there is insufficient evidence to determine functional limitations[,] and the severity of the treatment record.

2.    [Whether] [t]he ALJ's physical RFC determination is not supported by substantial evidence as he failed to order an updated medical opinion, even though he determined the [SAMCs' and SAPCs'] opinions were stale.

(doc. 20 at 5.)

### A.    <u>Duty to Develop the Record</u>

Plaintiff argues that the ALJ's mental RFC determination is not supported by substantial evidence because the ALJ failed to develop the record. (doc. 20 at 14.)

An ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits. *Newton v Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)). When the ALJ fails in this duty, he does not have before him sufficient facts upon which to make an informed decision, and his decision is not supported by substantial evidence.

18

*Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). For this reason, a reviewing court may reverse the ALJ's decision if the claimant can show that "(1) the ALJ failed to fulfill [her] duty to develop the record adequately and (2) that failure prejudiced the plaintiff." *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012). The duty to obtain medical records generally belongs to the claimant, however. *See Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205 at *7 (N.D. Tex. Mar. 25, 2011).

"The decision to order a consultative examination is within the ALJ's bailiwick." *Harper v. Barnhart*, 176 F. App'x 562, 566 (5th Cir. 2006). An ALJ must order a consultative evaluation when it is necessary to enable him to make the disability determination. *See Brock*, 84 F.3d at 728 (citing *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)). A consultative evaluation becomes "necessary" only when the claimant presents evidence sufficient to raise a suspicion concerning a non-exertional impairment. *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (per curiam). Isolated comments without further support by a claimant are insufficient to raise a suspicion of non-exertional impairment. *See Pierre v. Sullivan*, 884 F.2d 799, 802-03 (5th Cir. 1989) (per curiam) (holding isolated comments about claimant's low intelligence were insufficient to raise suspicion that claimant was mentally retarded); *Brock*, 84 F.3d at 728 (holding the claimant's references amounted to isolated comments because he did not mention non-exertional impairments in his original request for benefits, never sought medical treatment for such impairments, and did not mention these impairments at his hearing). When evidence in the record supports a conclusion that the claimant is not disabled, a consultative exam is not necessary. *See Turner*, 563 F.2d at 671. Additionally, the duty to develop the record can be

19

effectuated by the ALJ's questioning of the claimant regarding her education, training, past work history, the circumstances of her injury, daily routine, pain, and physical limitations, and providing an opportunity to add anything else to the record. *See Sun v. Colvin*, 793 F.3d 502, 509 (5th Cir. 2015) ("Consistent with that description, the court often focuses on the ALJ's questioning of the claimant in order to determine whether the ALJ gathered the information necessary to make a disability determination.") (citing *Brock*, 84 F.3d at 728).

Here, Plaintiff's anxiety and depression screenings noted only mild levels of anxiety and depression; he did not require any inpatient psychiatric hospitalizations or emergent or immediate outpatient mental health treatment; he had a limited history of mental health treatment with the Dallas VA Medical Center; and his medications and psychotherapy were generally successful in controlling his mental health symptoms. (doc. 16-1. 28, 339-45, 374, 378, 937, 1120, 1389-90.) At his compensation and pension examination, Dr. Dayton noted that Plaintiff described some traumatic events in his individual therapy sessions but "did not discuss war or service-related traumas at all," and he found that Plaintiff did not meet the criteria for post-traumatic stress disorder. (*Id*. at 345.) He diagnosed him with adjustment disorder with anxiety and found that the condition resulted in only occasional decrease in work efficiency and intermittent periods of inability to perform occupations tasks. (*Id*. at 340-41, 345.) The SAPCs found that Plaintiff's mental symptoms resulted in no more than minimal limits in the ability to function independently, effectively, and appropriately on a sustained basis, and imposed no more than non-severe impact functioning. (*Id*. at 68, 85.)

The ALJ considered a medical record that was over 1100 pages long and included over 4 years of treatment notes from Plaintiff's treating physicians, the medical records from the Dallas

20

VA Medical Center, and the opinions of the SAMCs and SAPCs. (*Id.* at 268-1460.) An ALJ's duty to develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (5th Cir. 2001). There is no indication that the medical records before the ALJ were inadequate, or that he lacked sufficient facts upon which to make an RFC determination. *See Pierre*, 884 F.2d at 802 ("The decision to require such an examination is within the discretion of the ALJ.").

The record reflects that the ALJ clearly considered the medical evidence in the record and gave Plaintiff's "subjective complaints the greatest consideration reasonably supported by the evidence." (*Id.* at 29.) He properly considered the evidence in the record, including the opinions by the SAMCs and SAPCs, to interpret the medical evidence and determine Plaintiff's RFC. *Taylor v. Astrue*, 706 F.3d 600, 602–03 (5th Cir. 2012) ("What [the plaintiff] characterizes as the ALJ substituting his opinion is actually the ALJ properly interpreting the medical evidence to determine his capacity for work."). The ALJ was not required to order a consultative examination because there is substantial evidence to support his RFC determination. *See Smith v. Berryhill*, No. CV H-18-2490, 2019 WL 3557586, at *9 (S.D. Tex. July 11, 2019), *report and recommendation adopted*, No. CV H-18-2490, 2019 WL 3548850 (S.D. Tex. Aug. 5, 2019) (finding that the ALJ was not obligated to order a consultative examination).

Moreover, even if certain aspects of Plaintiff's medical history were not included in the medical record, there is no evidence that he raised the need for an additional consultative examination at the hearing, or at any time before the ALJ rendered his decision. Because Plaintiff was represented by counsel at the hearing, no "heightened duty to scrupulously and

conscientiously explore all relevant facts" arose. *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003) (per curiam); *see*, *e.g.*, *Isbell v. Colvin*, No. 1:14-CV-006-C, 2015 WL 1208122, at *3 n.1 (N.D. Tex. Mar. 16, 2015) (noting that the ALJ did not have a heightened duty to develop the record where the claimant was represented by counsel). As noted, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. Plaintiff has not demonstrated how additional consultative examinations would have led to a more favorable decision. The ALJ fulfilled his duty to fully and fairly develop the record, and remand is not required on this issue.[3]

**B.    RFC Determination**

Plaintiff argues that the ALJ's physical RFC determination is not supported by substantial evidence because he failed "to order an updated medical opinion, even though he determined the State Agency consults' opinions were stale."  (doc. 20 at 21.)

 Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. §

---

[3] Even if the ALJ should have ordered a consultative examination, Plaintiff has also not shown that he was prejudiced in that the additional evidence would have been produced that might have led to a different decision. *See Thompson v. Colvin*, No. 4:12-CV-466-Y, 2013 WL 4035229, at *6 (N.D. Tex. Aug. 8, 2013). Any error was therefore harmless.

404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco*, 27 F.3d at 163-64. A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id*. Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, the ALJ determined that Plaintiff retained the physical RFC to perform less than a full range of sedentary work as defined in 20 C.F.R. § 404.1567(a), with no exposure to hazardous moving machinery and unprotected heights. (doc. 16-1 at 26.) He explained that he

gave Plaintiff's "subjective complaints the greatest consideration reasonably supported by the evidence." (*Id*. at 29.) He referenced Plaintiff's testimony that he went grocery shopping and attended his son's football games, and the medical reports indicated that he assisted in getting his children ready for school and tended to their school schedules. (*Id*. at 26.)

The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to produce some of the alleged symptoms," but his "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms, have been determined to diminish the capacity for basic work activities only to the extent to which they can be accepted as consistent with the medical evidence and other evidence" and the RFC. (*Id*. at 27.)" Although his reports of foot pain were supported by the record, the ALJ noted that Plaintiff had bilateral foot surgeries, and "the record reflects that th[o]se surgeries were generally successful in relieving [his] symptoms." (*Id*. at 28, 276, 283, 285, 292, 301-02, 306-07, 309-10, 1146, 1243, 1245.) The ALJ also noted that there was no evidence of additional treatment such as physical therapy or injections, or a need for further intervention for either foot. (*Id*. at 28.)

While there was evidence of mild degenerative disc disease of Plaintiff's lumbar spine, the ALJ found that the evidence did not support a disabling degree of impairment. (*Id*.) Plaintiff displayed full muscle strength, negative straight leg raises, normal reflexes, and he ambulated independently with a normal gait. (*Id*. at 364-69, 621-24, 929, 932, 934, 936, 1290, 1361, 1389, 1449-50.)  The ALJ highlighted the fact that there was no medical evidence of treatment or physical therapy, injections, or surgical intervention for his spine, and an EMG nerve conduction study of the right lower extremity showed no evidence of radiculopathy, plexopathy or myopathy. (*Id*. at 28, 1292.)

The ALJ specifically noted that he considered the updated medical evidence provide by Plaintiff and found that he was more limited than determined by the SAMCs' and SAPCs' assessments. (*See id*. at 22-26, 29.) A hearing officer is only required to request "an updated medical opinion from a state agency medical or psychological consultant when he believes such evidence could change their previous findings." *Ihde v. Colvin*, 270 F. Supp. 3d 956, 966 (W.D. Tex. 2017) (citing SSR 96–6p, 1996 WL 374180, at *3–4 (July 2, 1996)). This requirement relates to the assessment at step three; it does not relate to the determination of a Plaintiff's RFC, however. *See id*. Because the ALJ was not required to order updated medical opinions by the SAMCs or the SAPCs, and he relied on medical evidence in the record in making his RFC determination, his assessment was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment). Remand is therefore not required on this basis.

## IV.  CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, on this **23rd** day of November, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

25